# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 01-11482

D.C. Docket No. 3:00-CV-1762

U. S. COURT OF APPEALS
**FILED**

JAN 2 4 2003

CHARLES R. FULBRUGE III
CLERK

MCKINNEY BB, LP

> Plaintiff-Counter Defendant - Appellee

v.

US REALTY ADVISORS, LLC

> Defendant-Counter Claimant - Appellant

RH SERVICES COMPANY INC

> Intervenor Defendant-Counter Claimant - Appellant

Appeal from the United States District Court for the
Northern District of Texas, Dallas.

Before KING, Chief Judge, and JONES and EMILIO M. GARZA, Circuit
Judges.

### J U D G M E N T

This cause was considered on the record on appeal and was
argued by counsel.

It is ordered and adjudged that the judgment of the District
Court is affirmed.

IT IS FURTHER ORDERED that appellants pay to appellee the
costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE: FEB 1 7 2003

A true copy
Test

Clerk, U S. Court of Appeals, Fifth Circuit

By _____
Deputy

New Orleans, Louisiana

U. S. COURT OF APPEALS
FILED

JAN 2 4 2003

CHARLES R. FULBRUGE III
CLERK

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 01-11482

---

MCKINNEY BB, LP

      Plaintiff - Counter Defendant - Appellee

      v.

US REALTY ADVISORS, LLC

      Defendant - Counter Claimant - Appellant

RH SERVICES COMPANY INC

      Intervenor Defendant - Counter Claimant - Appellant

---

Appeal from the United States District Court
for the Northern District of Texas
(00-CV-1762)

---

Before KING, Chief Judge, and JONES and EMILIO M. GARZA, Circuit Judges.

KING, Chief Judge:[*]

      Appellants US Realty Advisors, L.L.C. and RH Services Company, Inc. appeal the district court's denial of their motion for partial summary judgment and the grant of summary judgment to Appellee McKinney BB, L.P.  Because the district court did not

---

      [*]  Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

err in determining that Texas law governs this case and that Appellants were not entitled to relief, we affirm.

## I. Factual Background

This appeal stems from a dispute over the terms and conditions of a contract for the performance of real estate brokerage services. US Realty Advisors ("US Realty") is a New York limited liability company with its principal place of business in Manhattan. It is a registered investment advisor focused on real estate, business trusts, and securities. US Realty offers sophisticated real estate advisory services to public pension funds, corporations, financial institutions, and private developers and investors on a nationwide basis. RH Services Company, Inc. ("RH Services") is an affiliate that exists solely for the benefit of US Realty and is a New York-licensed real estate brokerage entity. It has no employees of its own, as all individuals performing real estate brokerage services for RH Services are US Realty employees. Unlike RH Services, US Realty is not a licensed real estate broker in any state.

The property at issue in this case, the Blockbuster Distribution Center ("Blockbuster Property") located in McKinney, Texas and owned by McKinney BB, L.P. ("McKinney"), offered a business opportunity for US Realty because it necessarily

2

involved a single tenant net lease transaction.[2]  A former US Realty employee introduced officials from US Realty to those from McKinney, and contractual negotiations between the parties subsequently ensued.  The entirety of US Realty's activity with respect to the negotiations was performed in its New York office; at no time did any employee travel to Texas for the purpose of participating in the negotiations.  McKinney's agent, Keystone Strategies Inc. ("Keystone"), negotiated with US Realty from its office in Dallas, Texas.

At the end of negotiations, on September 13, 1999, McKinney retained by contract the services of US Realty and RH Services to market and structure the sale of the Blockbuster Property.  No US Realty employees traveled to Texas for the purpose of executing the retainer agreement, which the parties eventually labeled (and we will call) the Advisor Contract.  An executive vice president signed the Advisor Contract in New York and forwarded it to Keystone, who thereafter executed the Advisor Contract in Texas and sent an executed copy back to New York.

The Advisor Contract appointed US Realty to be the "exclusive disposition advisor with respect to the Property."  Under the agreement, US Realty would prepare a business analysis

---

[2]  Single tenant net leasing is a niche in real estate transactions in which US Realty has a level of expertise.  US Realty participates in $1 billion worth of such transactions annually.

3

of McKinney's interests, have an exclusive right to sell the Blockbuster Property on terms acceptable to McKinney, and generally act as McKinney's disposition advisor.  The agreement provided for US Realty's right, under certain conditions, to a fee of 1% of the purchase price if the Advisor Contract was terminated and the Blockbuster Property was nevertheless sold to a purchaser produced by US Realty.  Moreover, the Advisor Contract outlined varied services for US Reality to perform and noted that any and all real estate brokerage functions would be performed by RH Services.

The Advisor Contract also established several conditions to US Realty and RH Services' receipt of a commission.  First, the sale of the Blockbuster Property had to transpire within 180 days following the expiration of the Advisor Contract.  Second, the Advisor Contract required that within ten days of its expiration, US Realty had to notify McKinney in writing of any prospective purchaser of the Blockbuster Property with whom it had substantial contact.  This condition was inserted with the intention that Keystone and McKinney would know by a date certain whether there was a prospective purchaser who might purchase the Blockbuster Property within 180 days after the expiration of the Advisor Contract.

Originally, the Advisor Contract was scheduled to terminate on November 9, 1999.  It was extended on four occasions, each

4

time in writing and each time at the request of US Realty. The last written extension expired on December 21, 1999. Thus, pursuant to the express terms of the Advisor Contract, including all extensions, if US Realty expected to be compensated under the terms of the Advisor Contract, it had to meet the ten day written notice condition by January 2, 2000 and the closing of the sale to one of the prospective purchasers had to occur on or before June 18, 2000 (which was 180 days after the expiration of the Advisors Contract).

During the term of the Advisor Contract, US Realty and RH Services sent out twenty-seven confidentiality agreements to potential purchasers. They secured four bona fide offers for the Blockbuster Property, including the offer from Peak Holdings, which ultimately purchased the Blockbuster Property for $38,500,500. During this period of time, US Realty employees never traveled to Texas (or any other state) while providing services. Moreover, there was no conduct or activity on the part of US Realty employees outside the State of New York.

As of the expiration date of the final written extension of the Advisor Contract, US Realty and RH Services had secured a confidentiality agreement from B.T. Raike, Peak Holdings's broker, secured a $37 million offer from Lexington Corporate Properties Trust, and delivered a status report that revealed the activity and interest in the Blockbuster Property created by US

5

Realty and RH Services.  Yet, the Blockbuster Property still had not been sold and McKinney never extended the Advisor Contract beyond the expiration date of the final extension.  At this point, US Realty and RH Services departed from the written agreement by continuing to market the Blockbuster Property and broker deals with prospective purchasers.

Peak Holdings forwarded its initial offer directly to McKinney on January 28, 2000, and McKinney counteroffered.  On February 25, 2000, Peak Holdings acknowledged McKinney's counteroffer and made a final offer.  Peak Holdings and McKinney eventually entered into a contract for the sale of the Blockbuster Property on May 4, 2000.  McKinney agreed to indemnify Peak Holdings as to any claim by any broker or finder with which it dealt.  Although Peak Holdings signed the letter of intent, the final purchaser of the property was BV Realty Partners, a Texas limited partnership.  BV Realty Partners closed on the Blockbuster Property on July 28, 2000.[3]

## II. Procedural History

Prior to the closing on the Blockbuster Property, US Realty demanded from McKinney a commission for services rendered.  Upon

---

[3] Despite its efforts, US Realty fell short in meeting the two deadlines provided in the Advisor Contract, as it did not provide McKinney with a list of prospective purchasers by January 2, 2000 and, as of June 18, 2000, it had not facilitated a closing with a prospective purchaser that it had both contacted and identified.

6

receiving the payment demand from US Realty, McKinney initiated the underlying action in Texas state court, seeking a declaration that it did not owe compensation to US Realty under the Advisor Contract. McKinney advanced four arguments to establish US Realty's inability to recover: (1) US Realty was precluded from entitlement to fees by operation of the Texas Real Estate License Act ("RELA") because neither US Realty nor RH Services was a licensed broker in Texas; (2) US Realty did not fulfill a condition precedent to the recovery of a commission, i.e., that the sale of the Blockbuster Property had to be consummated within 180 days after the expiration of the Advisor Contract (since the Advisor Contract was never extended orally or in writing beyond December 21, 1999); (3) any oral extension or modification of the written agreement was unenforceable under the Statute of Frauds provisions of the Texas RELA; and (4) in any event, US Realty breached its obligations under the Advisor Contract by, _inter alia_, failing to prepare and revise financial reports and cash flow analyses.

US Realty removed the case to federal district court and asserted counterclaims for breach of contract and unjust enrichment. McKinney thereafter moved for summary judgment, contending that Texas law governed the controversy and the Texas RELA operated to preclude remuneration under both Texas and New York law.

7

RH Services intervened in the action as a defendant, and together with US Realty, cross-moved for partial summary judgment, maintaining that they had established their entitlement to quantum meruit recovery under New York law. They claimed New York law should apply because: (1) any fair application of the Texas choice of law rules points to New York as the state with the most significant interest in this controversy; (2) application of the procedural law of Texas, which includes the Statute of Frauds provision of the Texas RELA, would make the Advisor Contract's oral extension unenforceable and thus enable recovery under quasi-contract theory; and (3) application of the Texas Statute of Frauds does not preclude consideration of New York substantive law, which recognizes a cause of action for unjust enrichment when a licensed broker's performance of an unenforceable written agreement results in a clear benefit to the other contracting party.

The district court granted McKinney's Motion for Summary Judgment and denied US Realty and RH Services' Motion for Partial Summary Judgment. The court found that the Texas Statute of Frauds applied and barred US Realty and RH Services' unjust enrichment counterclaim. In denying the cross-motion for partial summary judgment, the court reasoned that even if it applied New York's Statute of Frauds, relief would remain unavailable to US Realty and RH Services because the proffered evidence showed that

8

US Realty, although unlicensed, provided brokerage services in the subject transaction, an act prohibited under New York law. The court further found that § 535.1 of the Texas Administrative Code precluded US Realty and RH Services' counterclaim because US Realty did not hold a Texas real estate license.

US Realty and RH Services appeal, seeking review of the district court's grant of summary judgment to McKinney and the denial of their partial summary judgment motion, including the district court's choice of law determination, interpretation of New York law, and application of the Texas Statute of Frauds and Administrative Code.

### III. Standard of Review

This court reviews the grant or denial of a summary judgment motion <u>de novo</u>, using the same criteria used by the district court in the first instance. <u>Pruitt v. Levi Strauss & Co.</u>, 932 F.2d 458, 461 (5th Cir. 1991), <u>abrogated on other grounds by Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.</u>, 55 F.3d 181, 185 (5th Cir. 1995). We review the evidence and any inferences to be drawn therefrom in the light most favorable to the non-moving party. <u>Id.</u> The district court's grant of summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any

9

material fact and that the moving party is entitled to a judgment as a matter of law.  Id.

### IV. Choice of Law; Unjust Enrichment

The determinative issue in this case is whether New York or Texas law governs the Advisor Contract.  Once this choice of law determination is made, then an assessment of the relief available to US Realty and RH Services can be made.  At the onset of this discussion, it is imperative to note that because we reach the conclusion that US Realty and RH Services were not entitled to compensation under unjust enrichment theory, it becomes unnecessary to determine whether US Realty and RH Services should additionally be denied compensation for failing to obtain a Texas real estate license.  Given this result, we leave to another court the task of parsing the words and phrases of the Texas administrative statute on real estate licensing.

A.   Analysis of the Choice of Law

A federal court sitting in diversity must apply the choice of law rules of the state in which it sits, e.g., Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 704-05 (5th Cir. 1999).  We thus consider the choice of law rules of Texas.  Texas courts follow the Restatement (Second) of Conflict of Laws in choice of law determinations involving contractual disputes. E.g., Minnesota Mining & Mfg. Co. v. Nishika Ltd., 953 S.W.2d

10

733, 735 (Tex. 1997).[4]  Moreover, the Texas Supreme Court, in interpreting the Restatement, has directed courts to consider which state had the "most significant relationship" to the particular substantive issue, Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 421 (Tex. 1984).  The particular substantive issue in this case is whether the Advisor Contract precludes RH Services and US Realty from recovering for the real estate brokerage services performed by them.  The existence of the Advisor Contract is essential to the choice of law issue before this court; US Realty and RH Services contend that New York law would enable them to recover despite the existence of the Advisor Contract, while McKinney contrarily avers that the presence of the Advisor Contract precludes recovery.

---

[4]  US Realty and RH Services raise several threshold questions that, under Texas law, must be answered prior to analyzing the choice of law under the Restatement.  First, if the case involves questions of remedy and procedure, State of Cal., Dep't of Mental Hygine v. Corpus, 309 S.W.2d 227, 230 (Tex. 1958), or a Texas statute points to the application of Texas law, Busse v. Pac. Cattle Feeding Fund, 896 S.W.2d 807, 814 (Tex. App.-Texarkana 1995, writ denied), then Texas law applies and a determination under the Restatement's "most significant relationship" criteria is unnecessary.  Unjust enrichment is not a remedy but is an alternative theory of recovery governed by the substantive law of contracts, see generally Knebel v. Cap. Nat'l Bank of Austin, 505 S.W.2d 628, 632 (Tex. Civ. App. 1974), rev'd on other grounds, 518 S.W.2d 795 (Tex. 1974) ("When our courts today refer to a claim 'on quantum meruit' reference is not being made to procedural rules but to the substantive rules of decision which govern disposition of the merits of the claim.").  There is no existing statute directing that Texas law applies to this claim.  An analysis of choice of law under the Restatement is appropriate.

Because Texas law requires us to consider which state's law has the most significant relationship to the particular substantive law under consideration, the Restatement provision that most directly implicates the legal issues arising from this case must be evaluated, along with the Restatement's more general default rules. Hughes Wood Prods., Inc. v. Wagner, 18 S.W.3d 202, 205, 206 n.2 (Tex. 2000).[5] A real estate brokerage contract is principally a contract for employment, not a sale or other contract conveying an interest in land. Richland Dev. Co., Inc., v. Staples, 295 F.2d 122, 125 (5th Cir. 1961). In interpreting Texas conflicts law, this court has observed that "[i]n cases involving contracts for the rendition of services, the Texas Supreme Court has particularly relied on section 196 of the Restatement" when the contract lacks a choice of law provision. Pruitt, 55 F.3d at 185. Thus, in a case involving a contract for

---

[5]    As Hughes Wood Products illustrates, the Restatement sets out specific rules in various sections that can always be superceded by the guidelines in § 6. The sections of the Restatement of Conflict of Laws are intended to be cross-applicable, a point that can be understood by reading the text of the sections themselves, as well as the commentary to the sections. An approach that disregards one rule for the other would be excessively formalistic and would ignore the lesson of Hughes Wood Products that the Restatement should be read and interpreted as an organic whole where the focal point is which state has the most significant relationship. It is for this reason that in our analysis of the case, we evaluate the facts not only under § 196, but under §§ 6 and 188 as well.

12

the provision of real estate brokerage services, it is clear that

we must incorporate § 196 into our analysis.[6]

1.    Applicable Restatement Sections[7]

Although § 196 suggests that the place of performance

generally will be conclusive in determining the applicable law

when evaluating service contracts without a choice of law

provision, e.g., DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 679

(Tex. 1990), this presumption can be overcome if another state

has the most significant relationship using the factors set out

in § 6.  See, e.g., Pruitt, 932 F.2d at 461.[8]  Thus, New York

---

[6]    McKinney argues that § 196 is implicated only when the
contract expressly provides for the performance of personal
services in a single forum.  McKinney is only half-correct in
this regard; the Comment to § 196 also states the section is also
invoked when it "can be inferred either from the contract's terms
or from the nature of the services involved or from other
circumstances."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 196 cmt. a.
Even though another state may have a more significant
relationship to the parties under § 6, § 196 is nevertheless
applicable because an inference may still be made that the
brokerage services called for by the Advisor Contract were to be
rendered by US Realty and RH Services in New York.  Further
supporting our consideration of § 196 is the Comment's statement
that the section applies to contracts with professional service
providers such as brokers.  Id.  It is apparent that McKinney's
reading of § 196 is far too restrictive.

[7]    In their counterclaim, US Realty and RH Services did not
seek a remedy of restitution and have not argued that § 221 of
the Restatement or this court's decision in Caton v. Leach Corp.,
896 F.2d 939 (5th Cir. 1990), governs this case.

[8]    The text of § 196 reads:

The validity of a contract for the rendition of services
and the rights created thereby are determined, in the
absence of an effective choice of law by the parties, by

13

law, as New York is the state of the performance of the contract, will govern in this case unless Texas has the most significant relationship to the transaction and the parties.  In this case, we conclude, after evaluating the § 6 interests and the § 188 contacts, that Texas has the most significant relationship because all services performed under the Advisor Contract were targeted in some way, shape, or form toward the Blockbuster Property in Texas.

In deciding which state has the most significant relationship, the § 6 factors should be evaluated using the contacts listed in § 188 of the Restatement.  See Maxus Exploration Co. v. Moran Bros., Inc., 817 S.W.2d 50, 57 (Tex. 1991).  According to § 6, to decide what state has the most significant relationship to the transaction and the parties, the court should consider:

> (a) the needs of the interstate and international systems;
> (b) the relevant policies of the forum;
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
> (d) protection of justified expectations;

---

> the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in section 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Id. § 196 (emphasis added).

14

(e) the basic policies underlying the particular field of
law;
(f) certainty, predictability, and uniformity of result;
(g) ease in the determination and the application of the law
to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971).  Section 188
states that, in the absence of an effective choice of law by the
parties, a number of contacts should be taken into account in
applying the principles of § 6.  These § 188 factors include:

(a) the place of contracting;
(b) the place of negotiation of the contract;
(c) the place of performance;
(d) the location of the subject matter of the contract; and
(e) the domicile, residence, nationality, place of
incorporation and place of business of the parties.

Id. § 188(2).  It is with these factors in mind that we begin our
evaluation of the specific facts of this case.

        2.    Relevant contacts

    The Texas Supreme Court has clarified the exact steps of our
analytic process.  In ascertaining the most significant
relationship, we first identify those state contacts that should
be considered.  Duncan, 665 S.W.2d at 421.  Once the contacts are
identified, the question of which state's law to apply is a
question of law.  Id.  Through consideration of the qualitative
nature of the identified contacts, i.e., how the contacts
implicate the broad state policy interests underlying the unjust
enrichment claim, we can then select the applicable law.  See id.

    The contacts in this case are readily identifiable and
relatively undisputed.  Texas is the place of contracting

15

(McKinney accepted US Realty's contract offer while in Texas);[9] the place of the subject of the Advisor Contract (property located in Texas); McKinney's domicile; and a place of the negotiation of the terms of the Advisor Contract.  New York is the place of the Advisor Contract's performance, a place of negotiation, and the domicile of US Realty and RH Services.  One of these contacts, the place of negotiation, is of minimal consequence in this analysis because the place where the parties negotiate is "of less importance when there is no one single place of negotiation and agreement, as for example, when the parties do not meet but rather conduct their negotiations from separate states," RESTATEMENT § 188 cmt. a, which is what occurred in the instant case; effectively, the place of negotiation contacts cancel each other out.  By sheer number, those contacts that do remain favor application of Texas law.

However, ending the inquiry at this point would be premature because the most significant relationship test hinges on the qualitative nature of the particular contacts with a state rather than the mere number of occasions.  We thus turn to the factors laid out in the Restatement to help us reach the correct legal conclusion.

---

[9]  Generally, the a contract is considered complete at "the place where the last act necessary to complete the contract is done, namely where the offer is accepted." Lockwood Corp. v. Black, 501 F. Supp. 261, 264 (N.D. Tex. 1980), aff'd, 669 F.2d 324 (5th Cir. 1982).

16

3.   Most Significant Relationship Analysis

Of the § 6 factors, there are only three that are relevant in the instant case.  Those factors that are applicable are the relevant policies of the forum, i.e., Texas; the relevant policies and interests of other interested states, i.e., New York; and the protection of justified expectations.[10]

### a.   Relevant Policies and Interests of Texas and New York

Combining the two interest-related factors into one discussion assists in the inexact science that is judicial balancing.  Weighing in Texas's favor are the places of the execution of the contract as well as the subject matter of the contract.  While US Realty and RH Services raise an argument that there is no legitimate Texas interest in regulating the services performed by New York brokers in their home state, Texas has an interest in securing the contract rights of its own residents, particularly when subject of contract is brokerage services for property located in Texas.  See DeSantis, 793 S.W.2d at 679-680

---

[10]  US Realty and RH Services argue cursorily that the needs of interstate and international system require application of New York law because the application of the Texas RELA to this case would unduly burden interstate commerce.  This argument is ultimately unpersuasive because US Realty and RH Services offer no analysis or evidence to support this assertion.  More importantly, because we focus our analysis on Texas's interest in evaluating the unjust enrichment claim, as opposed to the application of the RELA licensing requirements, the effect, if any, of RELA on interstate commerce is outside the scope of our review.

(finding, in a choice of law determination, that Texas had a greater interest than Florida in protecting the rights of Texas residents entering into contracts for employment). Moreover, in this case, it is reasonable to conclude that Texas has an economic interest in protecting Texas-domiciled land vendors from companies serving numerous individual customers in the national marketplace.

It is undeniable that New York has an interest in this dispute because the state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party that is to perform. RESTATEMENT § 188 cmt. e. However, diminishing New York's interest in the dispute is the plain fact that US Realty and RH Services market their services nationwide. US Realty advertises itself as a sophisticated company providing an array of services with a multitude of business contacts outside New York State. While New York provides the location of the headquarters of the company, and thus the place of performance for the each and every one of US Realty and RH Services' contracts, the state garners a negligible interest in all other facets of the dispute because the focus of US Realty's business strategy extends outside New York.

When both states have clear interests in the contractual dispute, the qualitative nature of the contacts with the state become increasingly important. We find no cogent reason why New

18

York would have a greater interest than Texas in this contractual dispute; if anything, the interests in this regard are evenly balanced and due to US Realty's national focus, are tipped slightly in favor of Texas.

### b.   Protection of Justified Expectations

The protection of justified expectation of the parties at the time of contracting is of considerable importance in the field of contracts. See id. § 188 cmt. b. Moreover, the need for protecting expectations impacts another § 6 factor: ensuring certainty, predictability, and uniformity of result. Id. Because we find that both parties had some expectation that Texas law would apply, this influential factor tips the scale in favor of the application of Texas law.

A handful of facts support this finding. Both US Realty and RH Services were keenly aware that McKinney was a Texas resident and that the Blockbuster Property was located in Texas. US Realty, which by its own account, is a multi-national, sophisticated investment-advising entity, elected not to put a choice of law provision in the Advisor Contract that it drafted. In effect, US Realty and RH Services knowingly left open the possibility that Texas law would apply in any dispute arising out of the contractual relationship.

Further clarifying the expectations of the parties is the Restatement itself. The Comment to Restatement § 188 supports a

19

presumption relating to the expectations of parties in the context of contracts concerning land.  It states:

> When the contract deals with a specific physical thing, such as land..., the location of the thing is significant.  The state where the thing ... is located will have a natural interest in transactions affecting it.  Also the parties will regard the location of the thing ... as important. Indeed, when the thing ... is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing ... was located would be applied to determine many of the issues arising under the contract.

Id. § 188 cmt. e.  In this case, it can be rightly assumed that the parties expected to some extent that Texas law would apply because all services performed under the Advisor Contract were targeted in some way, shape, or form, toward the Blockbuster Property in Texas.  Given the nature of real estate brokerage service contracts, the Blockbuster Property was clearly the subject matter of the Advisor Contract.  On balance, this factor favors the application of Texas law.

US Realty and RH Services argue that Advisor Contract's disclosure of New York-licensed RH Services as the brokerage service provider, as well as US Realty's lack of offices outside New York, were sufficient to create McKinney's expectation that New York law would apply.  It is US Realty who should have expected the likelihood that Texas law would apply, especially when drafting a contract – for a Texas customer wishing to sell land located in Texas – and leaving out a clear choice of law

20

provision.   Customer McKinney would justifiably expect Texas law to apply because the real estate that was the object of the transaction was located in Texas, New York was expected to have minimal impact on a nationwide marketing transaction, and the Advisor Contract omitted a provision stating which law governed. Given the Restatement's presumption as to the expectations of parties entering into contracts with land as the subject matter, we conclude that the expectation that Texas law would apply be placed on US Realty.

4. Which State Law Governs

Therefore, applying the guiding principles of the "most significant relationship test," we reach the conclusion that the factors weigh most heavily in favor of applying Texas substantive law to evaluate US Realty and RH Services' rights to compensation for services rendered.[11]

B.    The Unjust Enrichment Claims

---

[11]   While on its face, this outcome would appear to be harsh for national real estate brokerage firms and other related business entities, it must be emphasized that the Restatement's balancing analysis is highly fact dependent and thereby could result in differing choices of law in other scenarios.  A party wishing to avoid application of another state's laws to its business could simply include a choice of law provision in its contracts.  In Texas, contractual choice of law provisions are ordinarily enforced if the chosen forum has only a substantial relationship to the parties and the transaction.  See Access Telecom, Inc. v. MCI Telecomms., Corp., 197 F.3d 694, 705 (5th Cir. 1999) (citing DeSantis, 793 S.W.2d at 677-78).

21

Applying Texas substantive law, we now turn to the merits of US Realty and RH Services's claims of unjust enrichment.[12]  US Realty and RH Services claim that they are entitled to relief because McKinney was unjustly enriched by the services rendered during the term of the written contract.  It is well-established that Texas law prohibits a party from taking advantage of the remedy of unjust enrichment where "a valid, express contract governing the subject matter of the dispute exists."  E.g., Coghlan v. Wellcraft Marine Corp., 240 F.3d 449, 454 (5th Cir. 2001) (citing Woodward v. Southwest States, Inc., 384 S.W.2d 675, 675 (Tex. 1964)).  Here, the subject of unjust enrichment claim, i.e., compensation for services rendered, was covered by the Advisor Contract; the Advisor Contract specified how, when, and if a commission would be awarded.  In attacking the applicability

---

[12]  There is a question as to whether the Texas RELA precludes US Realty and RH Services from seeking damages under the theory of unjust enrichment.  US Realty and RH Services rely on Fifth Circuit precedent for their assertion that the Texas RELA Statute of Frauds does not bar their claim for unjust enrichment.  Morris v. LTV Corp., 725 F.2d 1024 (5th Cir. 1984) (finding that the Statue of Frauds provision of the Texas RELA invokes the procedural law).  They contend that Morris stands for the proposition that even in the face of a written agreement rendered unenforceable by the Texas RELA, a court sitting in diversity may apply the law of a foreign state and recognize a claim for unjust enrichment.  US Realty and RH Services are correct that the Statute of Frauds does not preclude our ability to examine the unjust enrichment claim on the merits; however, we will not address the issue of whether the Texas RELA's Statute of Frauds provides a procedural bar to US Realty and RH Services's unjust enrichment claims because we decide the case on contractual grounds alone.

22

of the Texas rule on unjust enrichment, US Realty and RH Services assert that because the Texas RELA Statute of Frauds rendered the entirety of the Advisor Contract unenforceable, no valid contract exists.  Such an assertion is patently incorrect, as only the oral extensions can be construed as unenforceable under the Statute of Frauds; the original written contract was entirely valid and enforceable.

Both sides agree with the district court's finding that the oral extensions of the Advisor Contract are unenforceable under the Texas RELA's Statute of Frauds.  While it is clear that the existence of the enforceable written contract precludes relief for US Realty and RH Services, the issue of whether they would be entitled to compensation for services rendered after the expiration of the Advisor Contract remains.  This is because, under Texas law, the Statute of Frauds's rendering of oral extensions as unenforceable does not inherently preclude recovery in quantum meruit for the reasonable value of services rendered pursuant to the oral extensions.  See, e.g., Campbell v. Nw. Nat'l Life Ins. Co., 573 S.W.2d 496, 498 (Tex. 1978).

In effect, US Realty and RH Services seek compensation for services that were not required of them by McKinney under the Advisor Contract.  Texas courts apply unjust enrichment "where there is a failure to make restitution of benefits received under the circumstances which give rise to an implied or quasi-

23

contractual obligation to repay, that is, where a benefit was wrongly secured or passively received which would be unconscionable for the receiving party to retain." E.g., Mowbray v. Avery, 76 S.W.3d 663, 679 (Tex. App.–Corpus Christi 2002, no pet h.) (citations omitted). The question thus becomes whether an obligation to repay, whether implied or quasi-contractual, arises here.

No such obligation arose between US Realty and McKinney. After the expiration of the Advisor Contract, US Realty engaged in several activities, including efforts to market the Blockbuster Property and secure three additional confidentiality agreements. However, after the expiration of the Advisor Contract, US Realty had no involvement with either Peak Holdings or its broker. In fact, Peak Holdings discontinued its efforts to send offers through US Realty, instead opting to conduct its sale negotiations with Keystone only. Further, no US Realty employee participated in structuring the proposed sale of the Blockbuster Property, and no US Realty employee participated in or was present during negotiations or the closing. Any benefit to McKinney that can be attributed to US Realty and RH Services' post-expiration services was negligible at best.

For these reasons, we find lacking US Realty and RH Services' claims that they were entitled to recovery under Texas unjust enrichment principles, either for services performed

24

during the term of the Advisor Contract or after its expiration.[13]

## Conclusion

After narrowing our review to US Realty and RH Services' claim of unjust enrichment, we find that Texas has the most significant relationship to the particular substantive issue in this case and thus, Texas law applies. In the final analysis, Texas law precludes US Realty and RH Services from receiving relief under the theory of unjust enrichment. For the above reasons, US Realty and RH Services have not raised a genuine issue of material fact that would allow them to recover under Texas law. Therefore, the grant of McKinney's summary judgment motion and the denial of US Realty and RH Services' cross-motion for partial summary judgment must be affirmed. US Realty and RH Services shall bear the costs of this appeal.

AFFIRMED.

---

[13] Because we find that Texas law governs this case and that it would prevent US Realty and RH Services from recovering, there is no need to address an alternative outcome under the law of the Empire State.